IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ABA, INC.
821 Kennedy Street, NW
Washington, DC 20011

PREMIER HEALTH SERVICES, INC.
7600 Georgia Avenue, NW
Suite 323
Washington, DC 20012

        Plaintiffs,

    v.

THE DISTRICT OF COLUMBIA
SERVE:
Attorney General for the District of Columbia
950 Pennsylvania Avenue, NW
Washington, DC 20053

        Defendant.

Case No.:

---

## COMPLAINT

Plaintiffs ABA, Inc. ("ABA") and Premier Health Services, Inc., ("Premier" and, collectively, "Plaintiffs") hereby appeal the D.C. Department of Health Care Finance's ("DHCF") decision to withhold Medicaid payments to Plaintiffs pursuant to 42 CFR §455.23 as set forth in the DHCF letters attached hereto as Exhibits A and B. In support whereof, Plaintiffs state as follows:

## OVERVIEW

1. Federal Medicaid regulations have long authorized state Medicaid agencies to withhold payments to providers, either in whole or in part, pursuant to 42 CFR §455.23(a) where such an agency is able to present "*reliable evidence* of fraudulent activity by the provider."

2. In 2011, however, congress passed the Patient Protection and Affordable Care Act (P.L. 111-148) ("ACA"). In section 6402(h)(2), the ACA authorizes state agencies to suspend payments, either in whole or in part, to providers under investigation for "credible allegations of fraud", unless the state determines that "good cause" exists not to suspend such payments.

3. Accordingly, on or about February 2, 2011, the Center for Medicare & Medicaid Services ("CMS"), the federal agency responsible for managing the federal Medicaid program, modified 42 CFR §455.23 (a) to conform with the ACA by making payment suspensions mandatory where a state agency determines that there is an ongoing investigation of a "credible allegation of fraud" against a provider.

4. Based upon the revised regulations, a "credible allegation of fraud" must have been "verified by the State". 42 CFR §455.2. Thus, upon receipt of an allegation, DHCF must conduct "a preliminary investigation to determine whether there is sufficient basis to warrant a full investigation." 42 CFR §455.14

5. If the findings of the preliminary investigation give DHCF "reason to believe that an incident of fraud or abuse has occurred", DHCF must refer the matter for investigation to the state's Medicaid fraud control unit, or an "appropriate law enforcement agency." 42 CFR at §455.15

6. On January 17, 2014, DHCF issued new policy guidelines interpreting 42 CFR §455.23.

7. By March 6, 2014, DHCF had concluded that nearly 52% of the District of Columbia's of PCA services faced credible allegations of fraud, and were thus subject to payment suspension.

## JURISDICTION AND VENUE

8.  Plaintiffs allege deprivation of rights secured by the Due Process clause of the Fourteenth Amendment as protected by 42 USC § 1983.

9.  This Court has jurisdiction over the claims herein pursuant to 28 USC §§ 1331, 2201 and 2202.

10. Venue is proper in this District under 28 USC §1391(b) on the grounds that all of the conduct at issue took place in the District of Columbia.

## PARTIES

11. Plaintiffs, Premier and ABA, are each District of Columbia corporations licensed by the DC Department of Health ("DOH") to provide Personal Care Aid ("PCA") services to District of Columbia ("District") residents eligible to receive Medicaid benefits.

12. Premier has been a duly licensed Medicaid provider in the District since 2006.

13. ABA has been a duly licensed Medicaid provider in the District since 2007.

## FACTS

14. On or about March 6, 2014, DHCF Director, Wayne Turnage, testified before the Counsel of the District of Columbia Committee on Health that:

> [b]ased on [DHCF Staff's] outstanding work and referrals to law enforcement over the past five years, we are now required to suspend payments for 52 percent of our home health care providers. Ex. C

15. Later in his testimony, Mr. Turnage confirmed that the suspended agencies had provided services to nearly 80% of the "beneficiaries who receive personal care" in the District.

16. Accordingly, the remaining, non-suspended providers represent the capacity to meet the needs of only 20% of the total demand for PCA services in the District.

17. On or about March 7, 2014, DHCF sent notice of suspension letters to Plaintiffs; however, Plaintiffs did not receive these letters until at least a week later, on March 14, 2013.

18. DHCF policy, consistent with 42 CFR § 455.23, requires that the notice of suspension of payments letter be sent via certified mail within five (5) days of suspension.

19. In this instance, however, DHCF's March 7, 2014 letter to Premier was sent to the incorrect address via certified mail.   Further, ABA never received the initial letter via certified mail. Ex. D

20. After complaints about not having timely received the notice letters, on or about March 21, 2014, DHCF sent a subsequent letter via email notifying Plaintiffs of its intent to withhold payments on all Medicaid claims submitted by Plaintiffs for PCA services.   DHCF did not letters were still not sent by certified mail as required by the applicable regulations.

21. While noting in the letters that it was not obligated to disclose any "specific information" to Plaintiffs, DHCF did include a "general allegation" in each letter that each Plaintiffs had "repeatedly billed and was reimbursed for Personal Care Aide services that were not supported by documentation."

22. Aside from this "general allegation", DHCF has not provided either Petitioner with any additional details regarding the factual basis upon which it concluded that "credible allegations of fraud" had been made against Plaintiffs.

4

23. Nevertheless, DHCF purports to afford Plaintiffs the opportunity for an administrative review in the letter, for which the Plaintiffs need only send "written evidence" for DHCF review within five (5) days of receipt of the letter.

24. Presumably, such written evidence would serve to disprove the heretofore undisclosed allegations against Plaintiffs.

25. DHCF also claims in the letter that the suspension is only temporary, and will remain in place until, among other events, the provider has "submitted written evidence justifying the termination of the suspension and DHCF has accepted the evidence and arguments."

26. DHCF offers no explanation in the letter as to how the Plaintiffs can possibly provide such exculpatory information in response to undisclosed "credible allegations of fraud."

27. In light of the fact DHCF does not provide the Plaintiffs with any information regarding the factual basis of the "credible allegations of fraud" against them, it is clear that, notwithstanding the language in DHCF's letter, Plaintiffs have been afforded no real opportunity to submit exculpatory information that could even remotely result in termination of the suspension.

28. Further, the "general allegation" offered by DHCF in the notice letter, is nonsensical when one considers the billing process implemented by DHCF.

29. Providers bill Medicaid by multiplying a pre-approved billing rate by the number of hours worked by each of its PCAs.

30. Timesheets provided by DHCF, which require the signature of both the PCA and the Medicaid beneficiary, serve as the basis for each provider's invoice submitted to DHCF.

31. Moreover, all Medicaid benefit recipients are required to be evaluated and obtain a prescription for PCA services from a medical doctor before receiving PCA assistance.

32. And, since November 13, 2013, DHCF has required that initial evaluations of individuals seeking to obtain PCA services via Medicaid be evaluated by a third party company prior to enrollment.

33. Plaintiffs proffer that an evaluation of their records will confirm that all of the required documentation is undoubtedly for payments received by Petitioner. Otherwise, Plaintiffs could not have received payment thereupon in the first instance.

34. So the "general allegation" that Plaintiffs billed for PCA services that were not "supported by documentation" is inconsistent with the basic facts of the DHCF billing process.

35. Moreover, credible allegations of fraud could exist, but, as has been documented on numerous occasions, more likely result from collusion among patients and PCAs, or fraud on the part of evaluating medical doctors and patients, as opposed to the PCA provider firms.

36. Further, the suspended payments represent more than 80% of ABA and Premier total revenues, respectively.   As a result, Plaintiffs face a precipitous and immediate reduction in revenue.

6

37. At the same time, applicable DOH regulations to require Plaintiffs to continue providing PCA services to Medicaid beneficiaries, notwithstanding the payment suspensions.

38. In order to terminate PCA services, Plaintiffs must provide Medicaid beneficiaries with at least 30 days' advanced notice.

39. Even still, Plaintiffs' obligations do not end with providing the requisite notice. Plaintiffs are required to provide PCA services until successful transfer of the Medicaid beneficiaries to alternative PCA providers is completed.  Failure to do so subjects Plaintiffs to the loss of their licenses as Medicaid service providers as will as to civil penalties and liability.

40. Moreover, said transfers cannot be completed without either (1) the recipient patient agreeing to the transfer; *and* (b) the transferee provider agreeing to accept the patient.

41. There is, of course, no guarantee that either will occur within a timeframe that is suitable to the Plaintiffs present cashflow capacity.  And the Plaintiffs have no control over whether the patient or the transferee agency agree to the transfer.

42. Plaintiffs cannot afford to pay PCAs indefinitely while facing an 80% or higher drop in revenue.    Indeed, no company could reasonably be expected to meet such an onerous requirement.

43. Plaintiffs will therefore be forced to shut down abruptly, or file bankruptcy, as they reach the end of their limited financial capacity.  Invariably, if and when they do shut down, they will lose their Medicaid provider licenses as a result of having failed to comply with their obligations to DOH.

44. It is further noteworthy that DHCF's own billing and payment practices have exacerbated Plaintiffs' current financial predicament.

45. DHCF is as many as ten (10) months behind on payments to providers related to waiver Medicaid beneficiaries who lack prior authorizations (PAs) for billing.

46. Upon information and belief, the amount of cash currently withheld from ABA based upon PAs is in the hundreds of thousands of dollars, and for Premier, the amount is at least $200,000.

47. Moreover, because of the problematic roll-out of new billing software by DHCF in 2013, Plaintiffs have already faced payment delays due to "glitches" in software that improperly rejected bills that should already have been paid.

48. Thus, Plaintiffs were already facing severe cash-flow constraints even before the payment suspension took effect.

49. Meanwhile, during a meeting held on March 26, 2014, DOH, which licenses Medicaid providers, confirmed that the providers will not be relieved of their obligations under DOH regulations to any degree, notwithstanding that DHCF has suspended all PCA payments.

50. Thus, the only viable option for Plaintiffs is to notify Medicaid beneficiaries immediately of the termination of services, and commence the process of transferring patients to other providers post haste.

51. But, as is noted in DHCF Director Wayne Turnage's hearing testimony before the City Council on March 6 2014, DHCF has suspended payments to all but a few remaining Medicaid providers, who presently represent only 20% of the total industry capacity; as a result, the remaining agencies do not have the capacity to accept the

transfer of all of the 80% of District residence requiring PCA services. Much less do so over the course of the next 30 days.

52. When this obvious issue of concern was raised in a meeting held at DHCF on March 26, 2014, it was observed by participants that non-suspended agencies are presently experience difficulties hiring new health aides in order to expand their own capacity as a result of existing regulations relating to the licensing and hiring of new PCAs.

53. In the same meeting, representatives of DHCF represented that the its ultimate goal is to provide the services presently provided by the PCAs directly. Yet, when a provider inquired as to when DHCF's capacity to take on transfers from suspended agencies could be expected to come online, the only response DHCF staff could offer is that "it is in process".

54. Additionally, on or about March 20, 2013, DOH sent letters to each of the suspended providers notifying them that their Medicaid licenses had been converted to provisional status. As explained by DOH staff at the meeting, this was done to ensure that DOH is able to closely monitor the suspended providers and their patients to ensure that beneficiaries' needs continue to be met. And if they are not, the offending providers' provisional licenses will be terminated. Ex. E

55. In the letters notifying Plaintiffs of the change of their licenses to provisional status, the agency's deficiency under section 44-504(a)(3) is cited as supporting the conversion of Plaintiffs' licenses to provisional status.

56. On closer review of DCMR § 44-504(a)(3), however, it is clear that neither Petitioner has been found to have violated the applicable provisions, which relate to deficiencies in the operations of the licensee.

57. Indeed, being the subject of an "credible allegation of fraud" is not a finding that any of the violations referenced under DCMR § 44-504(a)(3) have in fact occurred.  Nor has either petitioner lost its federal certification as is referenced in the second provision cited in the letter, 22B DCMR 3104.12, notifying Plaintiffs of the conversion of the licenses to provisional.

58. Because a provisional license is indicative of a deficiency in operations, Plaintiffs are currently being denied the opportunity to provide non-Medicaid patients with PCA services.

59. As a result, Plaintiffs are effectively prevented from providing PCA services under both Medicaid and private contracts.

60. Based its actions to date, it is clear that DHCF did not sufficiently anticipate and consider important operational and program impacts of its decision to summarily suspend more than 80% of the PCA provider capacity in the District.

61. Surely DHCF should have known that once payments were suspended without notice, providers would not be able to keep paying PCAs indefinitely and that; as a result, many beneficiaries could be abruptly left without services.

62. In this regard, DHCF has failed to comply with the provisions of 42 USC § 455.23(a) which requires suspension by state agencies "unless the agency has *good cause* not to suspend payments or to suspend payments only in part." (emphasis added)

63. DHCF's actions plainly reveal that it failed to properly consider and analyze whether there was good cause not to suspend the providers' payments.

64. With minimal planning and foresight, DHCF could have avoided the current perilous circumstances.

65. As a result of the poorly planned manner in which DHCF has orchestrated these suspensions, (1) thousands of the District's poorest and most vulnerable residents are at immediate risk of losing essential PCA services they rely upon to have their basic human needs met, such as eating, bathing, obtaining prescription medications, and attending important doctor's appointments; (2) thousands of PCAs who work hard to meet the needs of DC's most vulnerable residents will themselves face needless economic disruption as the remaining non-suspended agencies struggle to grow to four times their size; and (3)innocent Medicaid providers who have worked tirelessly to build successful business will lose their businesses and their licenses, even though they have not been found to have done anything wrong.

## COUNT I
### Declaratory Relief

66. Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs of this Complaint.

67. An actual and substantial controversy exists between Plaintiffs and Defendant as to their respective legal rights and duties. Plaintiffs contend that both on their face and as applied to Plaintiffs, the challenged laws violate the Due Process Clauses of the Fifth and Fourteenth Amendment, and § 1983, as well as the Constitution of the District of Columbia.

68. On all counts, Defendant claims otherwise. Accordingly, declaratory relief pursuant to 28 USC §2201 is appropriate.

## COUNT II
### Due Process of Law;
### US Const. Amend. XIV & 42 USC §1983

11

69. Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs of this Complaint.

70. Plaintiff's payment suspension violates Plaintiffs' due process rights with respect to their property interest in payments due for services billed and due prior the effectiveness of the suspension notice, which was not received by either Petitioner until March 21, 2014;

71. Plaintiff's suspension further violates Plaintiffs' due process rights with respect to their liberty interest in maintaining their licenses to provide services to the Medicaid program because the suspensions have been orchestrated in a manner and under circumstances that will necessarily result in Plaintiffs' loss of their Medicaid provider licenses and their right to earn income.

72. The suspensions were completed in a manner that is inconsistent with the applicable CMS regulations, which specifically provide for  good faith exceptions where the payment suspension is (a) not in the interest of the Medicaid program and where (b) other remedies implemented by the state could more effectively or quickly protect Medicaid funds than would implementing the suspensions (such remedies include appointing or hiring receivers or provisional managers to insure compliance and the continued viability of the providers, requiring the providers to hire outside contractors to monitor all new invoices; requiring providers to post a bond to insure that monies are available to offset any fraud, among others.

73. And, finally, DHCF has failed to provide sufficient interpretive guidance regarding 42 USC 455.23, such that Plaintiffs have not been informed as the definition of a "credible allegation of fraud" or what constitutes "good cause" thereunder.

## COUNT III
### Breach of Contract

74. Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs of this Complaint.

75. The manner in which DHCF conducted the suspensions described hereinabove violated Section 6 paragraph C of the Petitioner's contracts with Defendant, which expressly requires that *before* withholding payments DHCF must provide, among other things, a written notice of the basis for the sanction;

76. Further, the suspensions were never properly noticed via certified mail as required by statute and thus are not valid as the applicable regulations to not authorize notice via email.

77. Even if found to be valid notice, such notice is not effective until five (5) days prior to Plaintiffs' receipt of said notice on March 21, 2014, accordingly, Plaintiffs should be paid all amounts due prior to March 16, 2014.

## COUNT IV
### Unjust Enrichment

78. Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs of this Complaint.

79. By suspending payment in above manner, Defendants are being unjustly enriched, as they are able to significantly delay payment and directly benefit therefrom as Plaintiffs are virtually compelled to deliver services under circumstances indefinitely without reimbursement.

### JURY TRIAL DEMANDED

13

Respectfully Submitted,

_____

Reginald J. Richter
The Richter Law Group, PLLC
1101 15th Street, NW, Suite 910
Washington, DC 20005