_____
                                      )

**ABA, Inc.,** *et al.*,                )

                                   )

                **Plaintiffs,**     )

                                   )

          **v.**                  )     **Civil Action No. 14-550 (RMC)**

                                   )

**District of Columbia,**        )

                                   )

                   **Defendant.**    )

_____)

## OPINION ON MOTION FOR PRELIMINARY INJUNCTION

What happens when the District of Columbia abruptly stops payments for hundreds of home health care aides to Medicaid beneficiaries? When the D.C. Department of Health Care Finance ceased payments, without prior warning, to fifty-two percent of the providers who care for seventy-nine percent of the city's needy beneficiaries, chaos ensued. And, thus, this litigation.

Under the applicable federal regulation, Department of Health Care Finance (DHCF) determined that it was required to suspend Medicaid payments for home health care providers because there is a "credible allegation of fraud" against each of the Plaintiffs, "for which an investigation is pending under the Medicaid Program." *See* 42 C.F.R. § 455.23. Nonetheless, Plaintiffs were required to continue to perform all services until their patients were transferred to a new provider. After four weeks of providing services without compensation, Plaintiffs sued to require DHCF to resume payments before each Plaintiff literally ran out of money and was run out of business. After hearing testimony and arguments, the Court determined that DHCF intended to terminate Plaintiffs' contracts and to substitute itself and

other providers in their places, not merely to suspend payments temporarily. Thus, the Court concluded that Plaintiffs had shown a likelihood of success on the merits of their due process claim, *i.e.*, because Plaintiffs had a viable property interest, protected by due process, that DHCF could not terminate without prior notice and hearing. The Court issued a TRO requiring the agency to pay Plaintiffs for Medicaid services rendered on and after the dates of their terminations. *See* TRO [Dkt. 12]; Order Modifying TRO [Dkt. 16].

Plaintiffs then sought a preliminary injunction and the matter went to hearing on April 17, 2014. *See* PI Hrg. Tr. [Dkt. 40-1]. To accommodate the District's request for time to brief the issues, the Court extended the TRO to May 9, 2014. *See id.* at 215-20. Having now heard substantially more evidence, the Court holds that Plaintiffs have not demonstrated a likelihood of success on the merits because they have not presented evidence sufficient to demonstrate a property interest that is protected by due process, as they have not shown that DHCF intended to terminate them from the Medicaid program. As explained below, the motion for preliminary injunction will be denied.

## I. FACTS

Plaintiffs are ABA, Inc.; Premier Health Services, Inc. and its majority owner Chinenye Arungwa; Immaculate Health Care Services, Inc.; T&N Reliable Nursing Care, LLC; Nursing Unlimited Services, Inc.; and Health Management, Inc. (HMI).[1] *See* Am. Compl. [Dkt. 14]; HMI Compl. [Dkt. 31]. They are licensed home health care providers who are parties to Medicaid Provider Agreements with the District of Columbia.

"Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States [including the District of Columbia] so that

[1] HMI intervened just before the preliminary injunction hearing, as discussed in further detail below.

they may furnish medical care to needy individuals."  42 U.S.C. § 1396; *see also* DHCF Supp. [Dkt. 33] (Majestic Decl.) ¶ 4.  Although participation in the program is voluntary, participants must comply with federal requirements.  *Id.* § 1396a; *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990).  The program is regulated by the Centers for Medicare & Medicaid Services (CMS), a constituent agency of the Department of Health and Human Services (HHS).

        DHCF is the "State" Medicaid agency for the District of Columbia.  DHCF is charged with funding "the Medicaid program's provider payments, administrative overhead, and vendor contracts through a combination of federal and local dollars . . . ."  Pls. Exs. [Dkt. 8-1],[2] Ex. C (Testimony of DHCF Director Wayne Turnage before D.C. Council Committee on Health on March 6, 2014) (Turnage Testimony) at 3.  Since 1998, the federal government has covered seventy percent of the District of Columbia's Medicaid program costs.  *See* Majestic Decl. ¶ 6; *see also* Turnage Testimony at 3.  However, the costs of the personal care program grew rapidly after 2008, without apparent reason.  *Id.* at 6-8.  "[B]y the end of FY 2013, there were more than 10,000 beneficiaries receiving personal care services, reflecting an annual growth rate of 28 percent."  *Id.* at 7.  The unprecedented growth in the program created serious budget challenges, forcing DHCF to determine how to "contain the growth in this benefit while protecting the care for those Medicaid recipients who really need it."  *Id.* at 8.  DHCF's Long-Term Care Administration and Division of Program Integrity conducted an investigation, uncovered credible allegations of fraud against many home health care aide providers, and referred these allegations to law enforcement.[3]  Mr. Turnage told the D.C. Council Committee that as a result

---

[2] Plaintiffs filed Exhibits A through G to the Amended Complaint at Docket 8-1.

[3] When DHCF discovers suspected fraud, it refers the case to the Federal Bureau of Investigation, the D.C. Office of Inspector General's Medicaid Fraud Control Unit (MFCU), or to some other law enforcement agency.  Def. Supp. Opp'n [Dkt. 40] at 2.

of these findings, DHCF was about to suspend Medicaid payments to fifty-two percent of home health care providers who provide service in the District. *Id.* at 8. DHCF Director Turnage noted that "[t]his action will potentially impact [seventy-nine] percent of the beneficiaries who receive personal care and will require DHCF to expeditiously develop another option for delivery of this benefit in FY2014 and beyond." *Id.* at 9. Mr. Turnage told the D.C. Council Committee that DHCF had developed a "temporary solution," approved by CMS, whereby DHCF had authority to act as its own provider and could contract directly with a staffing agency to provide personal care aides to "mitigate any shortage of providers" created by the suspensions. *Id.* at 9, 11.

DHCF's suspension of payments to Plaintiffs is the subject of this lawsuit. On March 7, 2014, the day after Mr. Turnage testified to the Committee of the D.C. Council, DHCF apparently sent notice to all Plaintiffs that it was withholding payments for all claims submitted for Personal Care Aid (PCA) services to the District's Medicaid beneficiaries. Am. Compl. ¶ 21; Pls. Exs., Ex. A (March 7, 21, and 31 Letters to Premier) & Pls. Exs., Ex. B (March 7, 21, and 31 Letters to ABA).[4] The March 7 letter explained that DHCF was suspending Medicaid payments to Plaintiffs[5] pursuant to 42 C.F.R. § 455.23, which requires a State Medicaid agency to suspend payment temporarily if the agency has determined (1) there is a "credible allegation of fraud for which an investigation is pending under the Medicaid program" and (2) there is no "good cause"

_____

[4] DHCF does not contest that it sent each of the Plaintiffs the same series of letters, although Plaintiffs' Exhibits only include copies of letters to ABA and Premier.

[5] Plaintiffs allege that D.C. was already in arrears on payments it owed to them. Reimbursements to Plaintiffs have been delayed due to glitches in new billing software, *see* Am. Compl. ¶ 55, and DHCF is ten months behind on payments to providers "related to waiver Medicaid beneficiaries who lack prior authorizations (PAs) for billing," *id.* ¶ 53. These alleged past-due payments are not before the Court.

to continue payments.[6]  DHCF stated that it had determined that there was a credible allegation

of fraud against each Plaintiff because each had "repeatedly billed and [were] reimbursed for

---

[6] Section 455.23 provides:

(a) Basis for suspension.

    (1) The State Medicaid agency *must* suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity unless the agency has good cause to not suspend payments or to suspend payment only in part.
    (2) The State Medicaid agency may suspend payments without first notifying the provider of its intention to suspend such payments.
    (3) A provider may request, and must be granted, administrative review where State law so requires.

(b) Notice of suspension.

    (1) The State agency must send notice of its suspension of program payments within the following timeframes:
        (i) Five days of taking such action  unless requested in writing by a law enforcement agency to temporarily withhold such notice.
        (ii) Thirty days if requested by law enforcement in writing to delay sending such notice . . . .

. . .

(e) Good cause not to suspend payments.  A State may find that good cause exists not to suspend payments . . . if any of the following are applicable:
    (1) Law enforcement officials have specifically requested that a payments suspension not be imposed because [it] may compromise or jeopardize an investigation.
    (2) Other available remedies implemented by the State more effectively or quickly protect Medicaid funds.
    . . .
    (4) Beneficiary access to items or services would be jeopardized by a payment suspension because . . . (ii) The individual or entity serves a large number of beneficiaries within a HRSA-designated medically underserved area.

PCA services that were not supported by the documentation."  *See* Pls. Exs., Ex. A (Letters to Premier) & Ex. B (Letters to ABA).

Plaintiffs allege that the March 7 letters were supposedly sent by certified mail, but that Plaintiffs never received them.  Am. Compl. ¶ 21.  The March 7 letter was sent to Premier at the wrong address.  *Id.* ¶ 23.  After complaints from various home health care agencies about not having received any notice, DHCF sent a copy of the March 7 letter to each of the Plaintiffs by email.  *Id.* ¶ 24.  On March 21, 2014, DHCF also sent an identical letter to each Plaintiff by regular mail.  *Id.* ¶ 25.  The March 7 and 21 letters stated:

> The payment suspension is for a temporary period.   However, DHCF will continue to withhold payments until:
>
> 1. The agency or the prosecuting authorities determine that there is insufficient evidence of fraud by the provider;
>
> 2. Legal proceedings related to provider's alleged fraud are completed;
>
> 3. You, as the provider, have submitted written evidence justifying the termination of the suspension of payments and DHCF has accepted the evidence and arguments; or
>
> 4. An Administrative Law Judge with the Office of Administrative Hearings has ordered the resumption of payments.
>
> You have the right to request an administrative review in response to this notice by DHCF.   Please send your written evidence to DHCF to review within five (5) days of receipt of this notice. . . .

---

> . . .
> (6) The State determines that payment suspension is not in the best interests of the Medicaid program.

42 C.F.R. § 455.23 (emphasis added).  The current version of 42 C.F.R. § 455.23 was amended by HHS to conform to § 6402 of the Patient Protection and Affordable Care Act, P.L. 111-148 § 6402, 124 Stat. 119 (2010), which changed the nature of evidence required before suspension and mandates payment suspension when there are "credible allegations of fraud."  Section 455.23 previously permitted suspension of Medicaid payments where an agency had discovered "reliable evidence of fraudulent activity."  Plaintiffs do not challenge the new regulation.

> In addition to your right to request an administrative review by
> DHCF, you have the right to appeal this decision by filing a
> written request with the District of Columbia Office of
> Administrative Hearings [OAH]. You must file a written request
> for a hearing before an administrative law judge within fifteen (15)
> calendar days of receipt of this notice.

Pls. Exs., Ex. A (Letters to Premier) & Ex. B (Letters to ABA). On March 31, 2014, DHCF also

sent each Plaintiff a notice of suspension of payments for personal care assistance provided

under the Elderly & Persons with Physical Disabilities (EPD) Waiver Program.[7] *Id*., Ex. A

(Letters to Premier) & Ex. B (Letters to ABA).

On March 26, 2014, DHCF and the D.C. Department of Health (DOH) met with

the immediate Plaintiffs and other suspended providers of home health care services. DOH told

Plaintiffs that they are legally obligated to continue to provide Personal Care Aid to all patients,

despite payment suspension, until all Medicaid beneficiaries are transferred to alternative

providers. Am. Comp. ¶¶ 43, 62. DOH separately made it clear that failure to continue to

provide services, without payment, could subject each provider to loss of its license as a

Medicaid service provider as well as to civil penalties and other liability.[8] *Id*. ¶ 45. Plaintiffs

assert that they are required to give thirty days' notice to Medicaid beneficiaries before

transferring them to another provider. *Id*. ¶ 44. At the March 26 meeting, DHCF presented a

proposed process for transferring patients to non-suspended providers. *Id*. ¶ 58. Plaintiffs allege

---

[7] Plaintiffs are registered to provide general home health care aide services as well as services
under the EPD Waiver Program; because CMS has different provider identification numbers for
each program, the suspension of payments was noticed separately. *See* Def. Opp'n to TRO [Dkt.
6] at 3.

[8] Some of Plaintiffs' employees (registered nurses, licensed practical nurses and case managers)
are subject to license suspension or revocation if they "abandon" a patient by terminating,
without adequate notice, the nurse-patient relationship at a time when the patient needs further
emergency care. *See* D.C. Code § 3-1205.14(a)(30).

that the non-suspended providers did not have the capacity to accept all of Plaintiffs'

beneficiaries, *id*. ¶ 64, a point that DHCF does not dispute. On March 31, 2014, DHCF notified

Plaintiffs by email that it would release its plan for the patient transfer process the next day.

DHCF had not released any such plan before Plaintiffs filed this suit on April 2, 2014. *Id*. ¶ 60.

On March 20, 2014, DOH converted Plaintiffs' home care licenses to provisional

status under D.C. Code § 44-506(a)(1). Pls. Exs., Ex. E (Mar. 20, 2014 DOH Letters). Code

§ 44-506(a)(1) provides that a provisional license may be issued to a facility that has numerous

deficiencies, or a single serious deficiency, with respect to the standards under D.C. Code § 44-

504(a)(3).[9] Plaintiffs allege that placing their licenses on provisional status implies deficiencies

and/or wrongdoing and reduces their ability to obtain home care contracts with private payers.

Am. Compl. ¶ 72.

Plaintiffs filed a four count Amended Complaint against the District of Columbia.

Counts I and II allege violation of the Due Process Clause of the Fifth Amendment pursuant to

42 U.S.C. § 1983, and seek different forms of relief: Count I seeks declaratory judgment and

Count II seeks money damages.[10] *Id*. ¶¶ 95-110. Count III alleges breach of contract for failure

---

[9] D.C. Code § 44-504(a)(3) provides that the Mayor shall issue rules and establish standards for the construction and operation of licensed facilities including:

> safety and sanitation of facilities; organizational governance and administration; employee and volunteer training, staff membership and delineation of clinical privileges (in addition to the standards set forth in § 44-507), and other personnel matters; diagnostic, therapeutic, emergency, anesthesia, laboratory, pharmaceutical, dietary, nursing, rehabilitation, social, emergency and non-emergency transportation, and other services; infection control; patient/client/resident care and quality assurance; recordkeeping; utilization review; and internal complaint and appeal procedures.

[10] The Amended Complaint also asserts a claim against the District under the Fourteenth Amendment. Because the District of Columbia is a political entity created by the federal

to provide thirty days' notice prior to suspending payments. *Id.* ¶¶ 111-15 (citing Pls. Exs., Ex. F (Form Medicaid Provider Agreement, Art. VI C)). Count IV alleges unjust enrichment because DHCF suspended payments but the District continues to benefit from Plaintiffs' uncompensated services. *Id.* ¶¶ 116-17. Plaintiffs are also pursuing administrative remedies, which they contend will be too slow to save their businesses.

Plaintiffs moved for a TRO and preliminary injunction. Mot. for TRO & Prelim. Inj. [Dkt. 15].[11] A hearing was held on the request for TRO on April 9, 2014, and the parties provided limited testimony. Representatives for Plaintiffs testified regarding the imminent loss of the Plaintiff businesses. Ijeoma Arungwa testified on behalf of Premier Health Services, Inc.; Peter Atemnkeng testified on behalf of ABA, Inc.; Micah Nkeng testified on behalf of T&N Reliable Nursing Care, LLC; and Kenneth Osuji testified on behalf of Immaculate Health Care Services, Inc. Each of them asserted that approximately 95% of their company's revenues come from Medicaid and EPD Waiver Program payments for PCA services, that they had exhausted company reserves, and that they would not be able to fund company payrolls fully as of April 11 or April 18, 2014.[12] *See* TRO Hrg. Tr. [Dkt. 40-2] at 11-35; *see also* Pls. Supp. Decls. [Dkt. 19], Decl. of Osuji. Nursing Unlimited Services filed the Declaration of its President, Teresa Okala, who averred that 82.61% of the company's revenue came from Medicaid payments and the company could not fully fund payroll after February 28, 2014. *Id.*, Decl. of Okala. Claudia

---

government, the Due Process Clause of the Fifth Amendment, not the Fourteenth Amendment, applies. *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

[11] When they filed an Amended Complaint [Dkt. 14], Plaintiffs replaced their original motion for preliminary injunction [Dkt. 2] with the version filed at Docket 15.

[12] Approximately five percent of Plaintiffs' revenue derives from skilled nursing care services, case management services, and private payers. *See, e.g.*, TRO Hrg. Tr. at 17, 26, 30, 35. When the District suspended payment for Medicaid services, it also erroneously suspended payment for skilled nursing care and management services but it planned to correct this error. *Id.* at 43-44.

Schlosberg, Acting Senior Deputy/Interim Medicaid Director of D.C. Department of Health Care Finance, testified on behalf of DHCF.

On the record at the April 9 hearing, the Court found that Plaintiffs provided evidence of the imminent and complete collapse of their businesses. TRO Hrg. Tr. at 91-93. While economic loss alone does not constitute irreparable harm, it becomes irreparable if the loss "threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FEC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *accord World Duty Free Ams., Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000). DHCF's suspension of payment, together with DOH's insistence that Plaintiffs continue providing uncompensated PCA services, plus DHCF's lack of a plan for alternative providers, put Plaintiffs in a crushing vise that would inevitably drive them out of business. TRO Hrg. Tr. at 80, 88. The suspension of payment for PSA services reduced Plaintiffs' revenue by 82-95%. Plaintiffs provided evidence that they would not be able to fund their payrolls as of April 18 at the latest. Accordingly, the Court found that Plaintiffs had shown irreparable harm. *Id*. at 91-93.

The Court also determined that Plaintiffs had demonstrated a likelihood of success on the merits based on their property interest, *i.e.*, participation in the Medicaid program, which is protected by due process. *See, e.g.*, *Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137 (2d Cir. 1986). As of the TRO hearing, the record showed that DHCF had not merely "temporarily" suspended payment to Plaintiffs, but had "terminated" them from the Medicaid program and intended to replace them with itself, without a prior hearing. These findings were based on the testimony of Mr. Turnage to the D.C. Council Committee and the testimony of Ms. Schlosberg at the TRO hearing.

Mr. Turnage told the D.C. Council Committee that the suspension of payments to fifty-two percent of home care providers would interrupt services to seventy-nine percent of the needy beneficiaries and would cause a shortage of home care providers and that DHCF would contract directly with a staffing agency to provide personal care aides to mitigate the shortage of providers. Testimony of Turnage at 9, 11. Ms. Schlosberg testified at the TRO hearing that the District had received a provisional license from DOH and had contracted with other vendors to provide PCA services. TRO Hrg. Tr. at 46. Ms. Schlosberg definitively predicted that all Medicaid beneficiaries who receive home health care services from Plaintiffs would be transferred to DHCF and/or other non-suspended providers by April 11, 2014. *Id*. at 48; *see also id*. at 52 ("[W]e anticipated that those individuals who needed services could be served by other providers."). She also indicated that DHCF intended to provide services itself for a period of about six months, during which time it planned to assess each patient individually to determine which ones are entitled to PCA services because DHCF estimated that forty percent of those receiving PCA services did not really need such services. *Id*. at 39, 42, 50. However, as of March 7, 2014, when DHCF suspended payments to Plaintiffs, it did not know which patients were ineligible. DHCF needed a plan to accommodate 100% of all patients during the six-month period Ms. Schlosberg anticipated it would take to review each beneficiary's eligibility but such a plan was not in place.

By acting abruptly over such a large swath of its PCA service providers, DHCF created a situation in which (1) payments to Plaintiffs for PCA services were suspended; (2) Plaintiffs were required to continue to provide PCA services; (3) there was an insufficient number of home health care providers in the District of Columbia to which to transfer Plaintiffs' patients; (4) the duration of Plaintiffs' obligation to provide services was unknown because

DHCF's transition plan was not yet in place; and (5) Plaintiffs' assets were depleted. These facts strongly indicated the agency's intention to cease doing business altogether with Plaintiffs, which the Court interpreted as termination from the Medicaid program. *Id*. at 80-83, 89-93.

Based on the finding that DHCF intended to terminate Plaintiffs, the Court found that Plaintiffs had shown a likelihood of success on the merits. The Court also found that the balance of equities favored the Plaintiffs and that an injunction was in the public interest. *Id*. at 88, 93.[13]

On April 9, 2014, the Court entered a TRO requiring the District of Columbia to pay Plaintiffs, by April 15, 2014, for Medicaid services rendered on and after March 7, 2014. *See* TRO [Dkt. 12] at 1. The TRO was modified the next day to extend the date by which DHCF was to make such payment to April 17, due to constraints posed by the complex payment system. *See* Order Modifying TRO [Dkt. 16] at 1. Bond was not required, as the TRO only required the District to pay Plaintiffs for services rendered after a certain date, and the District could reduce the risk of payment for fraudulently billed services by reviewing Plaintiffs' invoices. *See* TRO Hrg. Tr. at 94.

After the TRO was entered, Health Management Inc. (HMI) filed an emergency motion to intervene as an additional plaintiff. *See* HMI Mot. to Intervene [Dkt. 22]. Despite the District's opposition, *see* Opp'n to HMI Mot. to Intervene [Dkt. 27], the Court granted the motion, *see* Minute Order filed Apr. 16, 2014. Under Federal Rule of Civil Procedure 24(a), an applicant may intervene as of right when the applicant (1) makes a timely motion; (2) has an

---

[13] As this Court repeatedly stressed during the TRO hearing, questions surrounding Plaintiffs' compliance with CMS regulations and/or allegations of fraud are not at issue in this case and the Court expresses no view on them. TRO Hrg. Tr. at 76, 88-89, 98. It is, of course, highly appropriate and necessary for DHCF to investigate and eliminate any fraud. The underlying merits of DHCF's fraud allegations will be addressed by these parties in their administrative hearings before the OAH and on any appeal therefrom to the D.C. Court of Appeals.

interest relating to the property or transaction that is the subject of the action; (3) is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) where the applicant's interests are not adequately represented by the existing parties.  Fed. R. Civ. P. 24(a); *see also Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 6 (D.D.C. 2007).  Under Rule 24(b) a court, in its discretion, also may permit intervention where the applicant  (1) makes a timely motion; (2) has a claim or defense; and (3) that claim or defense shares with the main action a common question of law or fact.  Fed. R. Civ. P. 24(b); *see also EEOC v. Nat'l Children's Ctr*., 146 F.3d 1042, 1046 (D.C. Cir. 1998).  HMI is a PCA services provider in much the same position as the other Plaintiffs in this case, as DHCF also suspended Medicaid payments to HMI for PCA services based on allegations of fraud. Because it seeks to adjudicate claims substantially similar to the other Plaintiffs and the District was not prejudiced, the Court in its discretion permitted intervention.  HMI filed its own Complaint and motion for TRO and preliminary injunction.  *See* HMI Compl.;[14] HMI Mot. for TRO & Preliminary Inj. [Dkt. 30].  HMI then participated in the hearing on a preliminary injunction (PI hearing), at which all parties presented evidence and/or testimony.  Because HMI made a showing that was consistent with that made by the other Plaintiffs at the TRO hearing, the Court granted HMI's request for a TRO.  *See* PI Hrg. Tr. at 218, 224-28; *see also* HMI Mot. for TRO & Preliminary Inj., Ex. A (Decl. of HMI CEO Robinson Abraham) ¶¶ 10-11, 40-41 (85% of HMI revenue is derived from PCA services under the Medicaid program; due to DHCF suspension of Medicaid payments to HMI on March 21, 2014, HMI would be forced to cease operations).  The Court entered a TRO requiring the District to pay HMI for Medicaid services

---

[14] HMI's Complaint alleges violation of the Due Process Clause of the Fifth Amendment and breach of contract; it seeks declaratory judgment, money damages, and injunctive relief.

rendered on and after the date of its alleged termination, March 21, 2014. *See* TRO Re HMI [Dkt. 36] at 1.[15]

Plaintiffs (including HMI) sought to convert the TRO to a preliminary injunction, and the District opposed. The PI hearing was held on April 17, 2014. Because the District requested time to prepare and file post-hearing briefs, the Court held the motion for preliminary injunction in abeyance and extended the TRO for all Plaintiffs to May 9, 2014.[16] *See* PI Hrg. Tr. at 215-20. The parties have filed numerous briefs, supplements, and exhibits. *See*, *e.g.*, Pls. Mot. for PI [Dkt. 15]; Def. Opp'n to TRO [Dkt. 6]; HMI Mot. for PI [Dkt. 30]; Def. Supp. Br. Re Jurisdiction [Dkt. 33]; Def. Supp. Opp'n [Dkt. 40]; HMI Supp. Mot. for PI [Dkt. 41]; Pls. Supp. Mot. for PI [Dkt. 43]; HMI Reply [Dkt. 53]; Def. Reply [Dkt. 54]; Pls. Reply [Dkt. 56

## II. LEGAL STANDARD

A party seeking a temporary restraining order or a preliminary injunction must establish that:

(a) the moving party is likely to succeed on the merits;

(b) it is likely to suffer irreparable harm in the absence of preliminary relief;

(c) the balance of equities tips in its favor; and

(d) an injunction is in the public interest.

---

[15] After the TRO hearing, DHCF sent letters to Plaintiffs giving them ninety days' notice that it would terminate their Medicaid Provider Agreements for convenience under Art. III A of the Agreements. *See, e.g.*, HMI Compl., Ex. 10 (Apr. 11, 2014 DHCF Letter to HMI); PI Hrg. Tr. at 124-25; *see also* Form Medicaid Provider Agreement, Art. III A.

[16] After the PI hearing, the District asked the Court to require all Plaintiffs to submit a bond. *See* Mot. for Bond [Dkt. 35]. The Court will deny the request for bond as moot because the motion for preliminary injunction will be denied and the TRO will be lifted.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) (the same standard applies to both temporary restraining orders and preliminary injunctions). The D.C. Circuit has further instructed that "the movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

In the past, courts have balanced the four factors on a "sliding scale," *i.e.*, a lesser showing on one factor could be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). *Winter* called this approach into question: "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm [despite a strong likelihood of success on the merits] is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added). The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors. *See Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring).

A district court may grant a temporary restraining order or a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but it is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). Because it is an equitable remedy, the issuance of an injunction lies within the discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

## III.  ANALYSIS

### A.  Likelihood of Success on the Merits

Plaintiffs contend that DHCF has deprived them of constitutionally-protected property rights to participation in the Medicaid program as shown by the suspension of Medicaid payments due for services rendered.  Due to the deprivation of property rights without a prior hearing, they assert a violation the Fifth Amendment Due Process Clause.  *See* U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").  However, after considering all of the evidence now before it, including that presented at the PI hearing, the Court finds that Plaintiffs are not likely to succeed on the merits because the suspension of Medicaid payments is temporary and due process is satisfied by a post-suspension hearing.

The Due Process Clause of the Fifth Amendment was intended to secure the individual from arbitrary exercises of governmental power.  *Daniels v. Williams*, 474 U.S. 327, 330 (1986).  To allege a procedural due process claim,[17] a plaintiff must establish that he had a protected interest in life, liberty or property.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *see also Elwell v. Byers*, 699 F.3d 1208, 1213 (10th Cir. 2012) ("The first step in assessing a claimed procedural due process violation is to identify a constitutionally protected liberty or property interest.").  After establishing a constitutionally-protected interest, a plaintiff must allege that government officials knowingly, and not merely negligently, deprived him of

---

[17] Due process encompasses both substantive and procedural components.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  To state a substantive due process claim, a plaintiff must assert that a government official was so "deliberately indifferent" to his constitutional rights that the official's conduct "shocks the conscience."  *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (government conduct must have been "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience").  Plaintiffs do not assert a substantive due process claim.

that interest, *see Daniels*, 474 U.S. at 335-36, without notice and an opportunity to be heard "at a meaningful time and in a meaningful manner," *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). To determine what procedural process is due, courts balance the following factors: (1) the private interest that will be affected by the restraint; (2) the risk of an erroneous deprivation of such interest through the procedures used; (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the Government's interest, including the burden of a hearing. *Mathews*, 424 U.S. at 335.[18] Thus, as the D.C. Circuit has recently held, "to make out a violation of due process, the plaintiff must show the Government deprived her of a 'liberty or property interest' to which plaintiff had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'" *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

Courts have held that termination from the Medicare/Medicaid program or debarment from government contract bidding constitutes a deprivation of a property or a liberty interest protected by due process. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) "[F]ormally debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause."); *Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137, 1144-45 (2d Cir. 1986) ("Health care providers have a constitutionally protected property interest in continued participation in the

---

[18] In *Mathews*, the Supreme Court held that a pre-termination administrative hearing satisfied the due process required for the termination of Social Security disability benefits. *Mathews*, 424 U.S. at 343-49.

Medicare and Medicaid programs, and thus are entitled to some form of hearing before being finally deprived of that interest." (internal citation omitted)).[19]

*Cleanmaster Indus., Inc. v. Shewry*, 491 F. Supp. 2d 937 (C.D. Cal. 2007), exemplifies the concept. There, the California Department of Health debarred a pharmacy from participating in the Medicare program due to unlawful billing practices. The pharmacy, which relied on the program for over eighty percent of its business, alleged that debarment infringed its liberty interest in its reputation for honesty[20] and thus that the pharmacy was entitled to a pre-debarment hearing. The court determined that the failure to provide the pharmacy with an opportunity to be heard prior to debarment from the Medicare program violated due process. *Id*. at 946.

The right to due process is *not* implicated when a contractor is not completely cut off from doing business with the government. In such circumstances, the contractor "fail[s] to show anything remotely close" to the preclusion necessary to infringe a constitutionally

_____

[19] In *Patchogue*, a nursing facility sought an injunction against a ban on reimbursement for new admissions to nursing facilities that had been imposed by the New York State Department of Health. The nursing facility asserted injury to its property interest in federal Medicaid and Medicare funds and injury to its liberty interest in its reputation. *Id*. at 1139, 1142. The court found that an informal administrative hearing held prior to the reimbursement ban satisfied due process and that a full evidentiary hearing was not required. *Id*. at 1145; *see also Vencor Nursing Ctrs., L.P. v. Shalala*, 63 F. Supp. 2d 1, 10-11 (D.D.C. 1999) (although nursing facility had a constitutionally-protected interest in not being terminated from the Medicare/Medicaid program, the court denied plaintiff's motion for preliminary injunction because plaintiff did not show likelihood of success on the claim that HHS termination procedures violated due process); *Pressley Ridge Schools, Inc. v. Stottlemyer*, 947 F. Supp. 929, 940 (S.D. W. Va. 1997) (recognizing entitlement to government benefits and finding that State Medicaid agency violated § 455.23, which only permits temporary withholding of payment, when it suspended payments indefinitely), *appeal dismissed*, 134 F.3d 1218 (4th Cir. 1998).

[20] A liberty interest is implicated where a charge impugns honesty or morality, the accuracy of the charge is contested, there is some public disclosure of the charge, and the charge is made in connection with the termination of employment or the alteration of some legal right. *Cleanmaster*, 491 F. Supp. 2d at 942.

protected interest.  *Trifax*, 314 F.3d at 644-45; *see also Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) (holding that the "'all is forgiven' message implicit" in the present award of a government contract "suggests the improbability of . . . a [reputational] shadow" arising from past criticism by the same government agency).

        In contrast to a provider's right to participate in the Medicaid program, there is no constitutional right to receive Medicaid payments.  *Guzman v. Shewry*, 552 F.3d 941, 950 (9th Cir. 2008).  In *Guzman*, the Ninth Circuit held that because there is no constitutionally-protected property right to Medicaid payments, there is no right to a pre-suspension hearing before Medicaid payments are temporarily withheld due to allegations of fraud.  Dr. Guzman sued the California Department of Health to enjoin his temporary suspension from the California Medi-Cal program due to accusations of fraud.  552 F.3d at 946-47.  The Ninth Circuit affirmed the district court's denial of an injunction, finding that Dr. Guzman had not asserted a constitutionally-protected interest.  He was not subject to debarment from government contracts, and even though there is "some generalized due process right to choose one's field of private employment," this liberty interest is implicated only when there is a complete prohibition on the right to engage in a calling.  *Id.* at 954 (citing *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999)).  A complete prohibition may be at issue where a plaintiff challenges the rationality of government regulations on entry into a particular profession, *see Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 238-39 (1957), or where a state seeks to permanently bar an individual from public employment, *see Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972).  Dr. Guzman did not assert such a claim; he challenged only a suspension of payment and not a loss of license to practice medicine.  552 F.3d at 954.

With the same analysis, the Fifth Circuit held in *Personal Care Products, Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011), that a Medicaid provider did not have a constitutionally-protected right to Medicaid reimbursements that were withheld pending a fraud investigation. The court found that payments for future claims could be withheld to offset potential overpayment that might be found, or penalty that might be imposed, when the investigation was complete. *Id.* All Circuits that have addressed the issue have determined that a *temporary* suspension of Medicare or Medicaid payments does not implicate due process and that no pre-suspension hearing is required. *See, e.g.*, *Clarinda Home Health v. Shalala*, 100 F.3d 526, 528-29 (8th Cir. 1996); *Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991); *Karnak Educ. Trust v. Bowen*, 821 F.2d 1517, 1520-21 (11th Cir. 1987); *Peterson v. Weinberger*, 508 F.2d 45, 48-49 (5th Cir. 1975).

   Plaintiffs misapprehend the applicable case law, often quoting it out of context, which contributes to their misunderstanding. For example, they quote *Border Area Mental Health Services, Inc. v. Squier*, Case No. 2:13-cv-00613 (D.N.M.) [Dkt. 29-3], *appeal dismissed*, 524 F. App'x 387 (10th Cir. Aug. 5, 2013), as stating that providers "have a property interest in payment for services delivered to Medicaid recipients." HMI Reply at 4 (citing *Border*, Case No. 2:13-cv-00613, at *8). The quote is divorced from the critical language surrounding it; the full quote makes it clear that there is no protected property interest in the immediate receipt of Medicare payments. Moreover, the district court in *Border* ruled against plaintiffs who, like Plaintiffs here, claimed that suspension of payments pending a fraud investigation under § 455.23 violated their right to due process. Rather, the *Border* court stated:

> [A]lthough Plaintiffs have a property interest in payment for services delivered to Medicaid recipients, the terms of Plaintiffs' provider agreements as well as federal and state law have carved out of that property interest the right to immediate payment while

> an investigation into credible allegations of fraud are pending. Because Plaintiffs have failed to establish a protected property interest in immediate payment under the circumstances described in their complaint, their deprivation of property claim necessarily fails.

*Border*, Case No. 2:13-cv-00613, at *8.

Plaintiffs also improperly rely on *Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914, 922-23 (D.C. Cir. 1991), for the proposition that they have a constitutionally-protected property interest in continuing to receive Medicaid payments. *See* HMI Reply at 4. In *Chaves*, HHS sued home health care providers to recoup Medicaid overpayments. The providers asserted the right to retain payments *already made*, circumstances entirely different than those presented here, and they challenged the HHS sample adjudication procedure for recoupment. Although the providers had a property interest in the monies they had received, the court determined that the HHS procedure was not constitutionally defective. *Chaves*, 931 F.2d at 922-23.

Plaintiffs further argue that this case is just like *Propert v. District of Columbia*, 948 F.2d 1327, 1331-32 (D.C. Cir. 1991), where the court found an individual had a protected property interest in his car and the District of Columbia violated his due process right by towing and destroying the car without prior notice and hearing. Plaintiffs insist that "[i]f the law in this jurisdiction requires due process prior to the destruction of an individual's car, surely due process is required before a business owner's interest in his company is destroyed by the District." Pls. Reply at 3.

Plaintiffs' claim that their businesses are being destroyed is much more attenuated than in *Propert*. They allege that: DHCF suspended payments from which more than eighty percent of their income was derived; DOH required them to continue providing PCA services without payment; continued funding of payroll costs without reimbursement has depleted

Plaintiffs' resources; and the combination of DHFC's actions and DOH's requirements would inevitably force them out of business.[21] The facts presented at the PI hearing refute Plaintiffs' allegations that they were required to continue providing PCA services indefinitely, without payment, and raised serious questions about whether they could have transferred their patients because there was an alleged insufficient number of non-suspended providers in the area.

Importantly, there is now evidence that the District had adequate capacity for the transfer of Plaintiffs' patients to other providers, so that if Plaintiffs did not want to continue to provide PCA services during the term of their suspensions, they could have transferred them. Plaintiffs did not rebut this evidence with evidence of their own, although it was clear that the Plaintiffs in the courtroom doubted it. *See* PI Hrg. Tr. at 215 (Court: "I do agree there was complete testimony that there was capacity. [I]t was greeted with some skepticism in the crowd."). Nonetheless, uncontested evidence carries the burden of persuasion.

Mr. Turnage described the history of the payment suspensions at issue here. He testified that on February 20, 2014, after the arrest and indictment of twenty-five individuals for Medicaid fraud, DHCF suspended payments to four providers (not Plaintiffs here) who were involved or impacted by the arrests and indictments. PI Hrg. Tr. at 56. DHCF immediately attempted to contact by phone and letter the 3,068 patients served by those providers. Many of

---

[21] Plaintiffs also allege that there was good cause *not* to suspend payments because there was an insufficient number of non-suspended providers in the area and DHCF had no alternative plan. *See* 42 C.F.R. § 455.23(e)(4) & (6) (good cause not to suspend payments exists when beneficiary access to services would be jeopardized or suspension is not in the best interests of the Medicaid program). The flexibility provided by the regulations shows that DHFC had more options than it considered. *See KBC Nursing Agency & HHC, Inc. v. D.C. Dep't of Health Care Finance*, Case No. 2014-DHCF-00084 (OAH May 5, 2014) (reversing temporary suspension of PCA provider "because DHCF failed to exercise discretion it had under the federal regulation to consider Petitioner's circumstances as applied to exceptions . . . ."). The Court does not reach this issue because it must first be exhausted in the administrative process and because it does not contribute to answering the question of whether DHCF suspended Plaintiffs temporarily or terminated their contracts.

the phone numbers and addresses for alleged patients turned out to be fraudulent, including locations such as the baseball stadium and the police department. *Id*. at 57 (Turnage). Of those contacted, 885 stated that they desired services. DHCF then conducted individual assessments of these persons and found that 335 were eligible for PCA services. *Id*. After this experience, Mr. Turnage reviewed DHCF's reports of investigation regarding allegations of fraud against other PCA service providers. He discovered that payment had not been suspended to other providers because law enforcement officials requested that payments not be suspended during the period of investigation. *Id*. at 58; *see* 42 C.F.R. § 455.23(e)(1) (good cause not to suspend payments exists when law enforcement requests that suspension not be imposed because it may jeopardize an investigation). The Office of Inspector General then rescinded its request to withhold suspensions, and Mr. Turnage proceeded to review all of the reports of investigation of PCA service providers in DHCF files. PI Hrg. Tr. at 59. He determined that each contained one or more credible allegations of fraud. *Id*.; *see id*. at 114 (some providers are accused of submitting false claims for home care services for patients who were in the hospital at the time the services were allegedly rendered).

Mr. Turnage testified that the good cause exception relating to capacity did not "trigger" because DHCF had the capacity to serve the Medicaid beneficiaries impacted and that "[c]apacity was not an issue because we only found from the first four agencies that we suspended, only ten percent of the [patients] were legitimate." *Id*. at 62. Further, DHCF entered into ninety-day contracts with five additional providers, *id*. at 156 (Schlosberg), via an emergency procurement approved by CMS, *id*. at 62, 64, 81 (Turnage). Ms. Schlosberg testified that DHCF did not know how long it needed to have such contracts in place and "it is not the intention of the department to continue to serve as a Home Health Agency." *Id*. at 158. Yvonne

Iscandari, Long Term Care Director at DHCF, testified that the five contract providers started with the capacity to take 300 patients each and could, if needed, increase their capacity in a week or two. *Id*. at 186.

DHCF suspended payments to Plaintiffs in two waves: on March 7 and on March 21. *See* Am. Compl. ¶ 21; HMI Compl. ¶¶ 18, 33; PI Hrg. Tr. at 84 (Turnage). DHCF and DOH held a meeting on March 26 with suspended providers. The purpose of the meeting was to remind providers that they were required to provide PCA services until beneficiaries were transferred, to ask providers whether they would continue to provide PCA services despite payment suspension, and if they would not, to assist them in processing transfers. PI Hrg. Tr. at 176-81 (Iscandari). DHCF also notified patients that because their PCA service providers were under suspension they might lose service and they had the option of choosing another provider. *Id*. at 82, 100 (Turnage). DHCF asked Plaintiffs for a list of all patients they wished to transfer and expected that the process of transferring all patients would take about forty-five days. *Id*. at 84, 99 (Turnage). There is no evidence that any of the Plaintiffs responded. Some of the Plaintiffs have refused to transfer their patients. *Id*. at 148 (Robinson Abraham, CEO of HMI) (HMI plans to provide PCA services until "appeal mechanisms" are exhausted); Def. Supp. Opp'n, Ex. C [Dkt. 40-3] (T&N Reliable Nursing Care Letter) (advising patients not to transfer, stating that "[i]f someone calls from the DHCF . . . and tells you that T&N Reliable is closing down and wants you to transfer to a different provider Agency, please tell them to present you the court judgment to that effect."); PI Hrg. Tr. at 185 (Iscandari) ("[A]ide[s] and staff from the exiting agency [have told patients] not to sign anything."). Plaintiffs can continue to submit invoices to DHCF for PCA services rendered during the period while they are in suspended

status; if Plaintiffs prevail in defending against the underlying fraud allegations, DHCF will have to pay those claims. *Id.* at 127 (Turnage).

        In sum, Plaintiffs have not persuaded the Court that they are likely to succeed on the merits of their claim that they were terminated from the Medicaid program in violation of their right to due process. The District did not terminate Plaintiffs' licenses improperly[22] or otherwise debar them from participating as providers in the Medicaid program. The District presented evidence that the temporary suspension of payment for PCA services under § 455 was just that—temporary. The District continues to pay Plaintiffs for other types of Medicaid services, such as skilled nursing and case management services. *See* TRO Hrg. Tr. at 43-44 (Schlosberg). Such payments underscore the fact that the District has not terminated Plaintiffs from the Medicaid program. *See Trifax*, 314 F.3d at 644-45 (where a contractor still does some business with the government, the contractor cannot prove termination or debarment necessary to show that a constitutionally-protected liberty interest has been violated.)

        Plaintiffs also claim that the DOH conversion of their licenses to provisional status deprives them of a constitutionally-protected liberty interest in maintaining their licenses in full. However, the provisional status of the licenses does not affect Plaintiffs' ability to provide Medicaid services. There is no authority for the proposition that a license conversion to provisional status gives rise to a due process claim.[23]

---

[22] The ninety day notices of termination "for convenience," issued after the TRO hearing, are not at issue here.

[23] Plaintiffs speculate that they will lose their licenses because (1) DHCF has suspended payments, (2) they are required to provide services until they transfer their patients to another provider, (3) there are an insufficient number of providers available to take Plaintiffs' patients, and (4) Plaintiffs cannot afford to pay their employees due to the payment suspension and their employees will not come to work if they are unpaid, leaving patients unserved, in violation of their licenses. However, the District has presented evidence that capacity is not an issue, thereby undermining a key component of Plaintiffs' theory. There is no evidence that Plaintiffs tested

It is also unlikely that Plaintiffs will succeed on their claim for breach of contract.

Under the General Provisions of the Medicaid Provider Agreement, providers agreed "[t]o

satisfy all requirements of the Social Security Act, as amended, and [to] be in full compliance

with the standards prescribed by Federal and State [authorities]" and "[t]o accept such

amendments, modifications or changes in the program made necessary by amendments,

modifications or changes in the Federal or State standards for participation."  Pls. Exs., Ex. F

(Form Medicaid Provider Agreement), Art. I C & D.  If DHCF determines that a provider has

failed to comply with Federal or District law, DHCF may do all of the following:

> A.  Withhold all or part of providers' payments; and/or,
>
> B. Terminate the Agreement within 30 days from the date of notice
> to the provider.
>
> C.  Before taking action described in VI, A & B, the Department
> shall provide written notice to the provider . . . .

*Id.*, Art. VI A - C.

Plaintiffs erroneously allege that DHCF was required to provide thirty days'

notice prior to suspending payment.  Am. Compl. ¶ 112; HMI Compl. ¶ 176.  The terms of the

Medicaid Provider Agreements, however, require thirty days' notice for termination, *see* Form

Medicaid Provider Agreement, Art. VI B, not for suspension of payments, *see id.*, Art. VI A.

Moreover, the Medicaid Provider Agreements were subject to Federal law, including 42 C.F.R.

---

the ability of DHCF to accept all of their patients.  To the contrary, if faced with the emergency
of numerous beneficiaries wanting to transfer from Plaintiffs to other providers all at once,
DHCF would have exercised administrative fiat to place patients immediately with other care
providers.  PI Hrg. Tr. at 209 (Iscandari); *see also id.* at 163 (Schlosberg) & 175-78, 181
(Iscandari).  It is uncontested that, as providers, Plaintiffs did not have the authority to "place"
patients with a provider the patient had not chosen, but that DHCF could have done so in an
emergency situation.  *Id.* at 209 (Iscandari).  It is this authority on which DHCF relies to state
that it could have force-transferred any number of patients without following the thirty days'
notice and patient choice-among-options requirements that Plaintiffs needed to abide by to
accomplish the same transfer.

§ 455.23.  As amended pursuant to the Affordable Care Act, § 455.23 now requires State Medicaid agencies, such as DHCF, to suspend payments to a provider upon determining (1) that there are credible allegations of fraud and (2) no good cause exception applies.  Section 455.23(b) also provides that notice should be given within five days *after the suspension*.  The parties agree that DHCF complied with the five day post-suspension notice provision. Accordingly, Plaintiffs have not shown likelihood of success on the merits of their breach of contract claim.

Nor are Plaintiffs likely to succeed on the merits of their claim for unjust enrichment.  A claim for "unjust enrichment" may be asserted when one party receives a benefit from another under circumstances that make it inequitable for the defendant to retain the benefit without the payment of its value.  *Kramer Assoc., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 254 (D.C. 2005).  However, there can be no recovery for unjust enrichment when there is an express contract between the parties, *see Schiff v. Am. Ass'n of Retired Person*, 697 A.2d 1197, n.2 (D.C. 1997), unless the express contract does not fully address the subject matter, *see Ver Brycke v. Ver Brycke*, 843 A.2d 758, 772 n.9 (Md. 2004).[24]  Here, the relationship between Plaintiffs and DHCF is governed by express contracts, the Medicaid Provider Agreements.  The Agreements address the matters raised here, at least by reference to federal regulation.  Plaintiffs are not likely to succeed on a claim of unjust enrichment.

### B.  Exhaustion of Administrative Remedies

Plaintiffs also cannot demonstrate likelihood of success on the merits because they have not exhausted administrative remedies.  "Where a failure to exhaust administrative

---

[24] In the face of a written contract, a plaintiff may plead unjust enrichment in the alternative, as unjust enrichment may apply if the written contract is found to be invalid or unenforceable.  *See McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F. Supp. 2d 1, 21 n.10 (D.D.C. 2009).  Plaintiffs do not challenge the validity or enforceability of their contracts.

remedies would likely preclude an award of relief at the end of the litigation, the party seeking relief has not made a sufficient showing of probability of ultimate success to obtain a preliminary injunction." *Wallace v. Lynn*, 507 F.2d 1186, 1189 (D.C. Cir. 1974). The purpose of exhaustion is to give notice of the claim, to narrow the issues for prompt adjudication, *see Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 n.325 (D.C. Cir. 1976), to afford the agency an opportunity to resolve the matter internally, and to avoid unnecessarily burdening the courts, *see Wilson v. Pena*, 79 F.3d 154, 165 (D.C. Cir. 1996); *Wallace*, 507 F.2d at 1190 (citing *McGee v. United States*, 402 U.S. 479, 484 (1969)). The assertion of a constitutional right does not excuse exhaustion. *Wallace*, 507 F.2d at 1190; *Marine Mammal Conservancy v. Dep't of Agriculture*, 134 F.3d 409, 413 (D.C. Cir. 1998) (administrative appeals may not be bypassed merely because the litigant asserts a constitutional claim). Exhaustion is excused, however, when the relief available through the administrative process is inadequate, *see Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986), or exhaustion would be futile, *see Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1081 (D.C. Cir. 1978).

Plaintiffs allege, but have not shown, inadequacy or futility. All Plaintiffs are pursuing their administrative remedies and hearings are proceeding in the OAH. *See, e.g.*, Pls. Mot. for TRO [Dkt. 15] at 8; TRO Hrg. Tr. at 18-19 (Premier), at 29 (T&N), at 23 (Immaculate); PI Hrg. Tr. at 41 (ABA); HMI Compl. ¶ 52 ("HMI filed an appeal to the OAH seeking expedited review."). Mr. Turnage has met individually with the executives of some of the Plaintiff companies and tried to work out a compromise. *See* PI Hrg. Tr. at 112-16, 119-21 (Turnage). At the time of the PI hearing, those conversations were ongoing. *Id*.

There is no indication that OAH will refuse to hear Plaintiffs' claims or that OAH cannot grant the relief Plaintiffs seek. In fact, OAH recently reversed payment suspension and

ordered back payments to a Medicaid provider who, like Plaintiffs, objected to DHCF's March 7 suspension of Medicaid payments due to allegations of fraud.  *See KBC Nursing Agency & HHC, Inc. v. D.C. Dep't of Health Care Finance*, Case No. 2014-DHCF-00084, at *18 (OAH May 5, 2014).  That case involved thirteen alleged incidents of fraud that occurred over five years ago. *Id*. at *2.  There were no allegations of ongoing fraud, and the provider had demonstrated a record of policing and reporting suspected fraud, and terminating contracts with subcontractors suspected of fraud.  *Id*.  After suspension, the provider had encountered "extreme difficulties in transferring patients" to non-suspended providers due to a system-wide shortage.  *Id*.  DHCF had determined it had no discretion but to suspend all Medicaid payments temporarily whenever there is a credible allegation of fraud and it did not consider the availability of other remedies that could more fully protect Medicaid funds.  *Id*. at *2, *16.  Because an agency vested with discretion to choose among alternatives abuses that discretion when it fails to recognize and exercise it, *see Teachey v. Carver*, 736 A.2d 998, 1004 (D.C. 1999), the Administrative Law Judge (ALJ) found that DHCF erred.  The ALJ reversed the suspension of payment without prejudice, leaving DHCF free to review the matter and issue another suspension notice in the future.  *KBC Nursing*, Case No. 2014-DHCF-00084, at *18.

In sum, the *KBC Nursing* case reveals that administrative exhaustion is not inadequate or futile.  Plaintiffs' failure to exhaust administrative remedies is yet another reason why they have not shown a likelihood of success here.  The failure to show likelihood of success on the merits precludes a preliminary injunction, as Plaintiffs must make a positive showing on every prong.  *Davis*, 571 F.3d at 1292 ("[M]ovant has the burden to show that all four factors . . . weigh in favor of the injunction.").  Accordingly, the motion for preliminary injunction will be

denied and this case will be dismissed without prejudice to allow Plaintiffs to exhaust administrative remedies.[25]

## IV. CONCLUSION

As explained above, Plaintiffs' motion for preliminary injunction [Dkt. 15 & 30] will be denied. Further, this case will be dismissed without prejudice to allow Plaintiffs to exhaust administrative remedies. The TRO [Dkt. 12], as modified [Dkt. 16], will be lifted immediately upon the posting of this Opinion and accompanying Order. Further, the following motions will be denied as moot: the District's motion for bond [Dkt. 35]; motions to intervene as plaintiffs filed by Nursing Enterprises, Inc. [Dkt. 37] and Vizion One, Inc. [Dkt. 47]; Plaintiffs' motions [Dkt. 49 & 52] for an order to show cause why the District of Columbia should not be held in contempt for failure to comply with the Court's April 9, 2014 temporary restraining order; and [60] motion for leave to file supplement to Plaintiffs' post-hearing brief. A memorializing Order accompanies this Opinion.


Date: May 9, 2014


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

---

[25] Two additional parties, Nursing Enterprises, Inc. and Vizion One, Inc. have moved to intervene as plaintiffs. *See* [Dkt. 37 & Dkt. 47]. Because the motion for preliminary injunction will be denied and the case dismissed without prejudice, their motions to intervene will be denied as moot.